UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| DANIEL KISLIUK,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF FORT BRAGG, et al.,<br><br>    Defendants. | Case No. 23-cv-06358-RMI<br><br>**ORDER ON MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 34, 35, 36, 42 |

Now pending before the court is the motion (Dkt. 35) of Defendants Rory Beak, City of Fort Bragg ("City"), Jarod Frank, Colin McHugh, and Thomas O'Neal to dismiss Plaintiff's third amended complaint (Dkt. 34). Plaintiff has also filed two motions for leave to amend his complaint (Dkts. 36, 42). Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the court finds the matter suitable for disposition without oral argument. For the reasons stated below, Defendants' motion is GRANTED IN PART AND DENIED IN PART, and Plaintiff's motions are DENIED WITHOUT PREJUDICE.

**I.    Factual Background**

Plaintiff owns a radio which he uses as a "scanner" to listen to police radio traffic. *See* Dkt. 34, p. 3. Police suspected that Plaintiff was "responsible for months of radio interference" disrupting the police radio frequency, although Plaintiff only briefly owned a radio capable of causing such interference. *Id.* at 7.

At 9:00 A.M. on April 13, 2023, Plaintiff was in his hotel room listening to the police channel on his radio when he heard a call come in about a loose pit bull. (Dkt. 34, p. 3). Concerned that the dog might be violent, Plaintiff left his hotel room to look for it. *Id.* However,

when he arrived at the location 20 to 25 minutes later, he did not see a pit bull. *Id.* at 3–4. He then decided to check his mail at the nearby Mendocino Coast Hospitality Center ("Hospitality Center"). *Id.* at 4.

That morning, the Hospitality Center was staffed by two receptionists: Jessica Fitch and Brianna Cannon. (Dkt. 34, p. 4). Plaintiff had a previous history with Ms. Fitch; in the past, she had treated him "in a biased and discriminatory manner" and opened his mail. *Id.* Additionally, Ms. Fitch had a criminal history which included drug use, receiving stolen property, and "misleading the court". *Id.* at 5.

Plaintiff arrived at the Hospitality Center around 9:30 A.M. (Dkt. 34, p. 4). While he collected his mail, he vented to Mses. Fitch and Cannon that "pit bulls are going crazy in Fort Bragg." *Id.* He told them that if he was ever attacked by a pit bull, he would kick it in the face. In total, Plaintiff was at the Hospitality Center for less than 5 minutes. *Id.*

Immediately after Plaintiff left the facility, Ms. Fitch called police. (Dkt. 34, p. 4). In a later-issued warrant, Officer Beak summarized Ms. Fitch's report as follows: "Officers were dispatched to contact a reporting party who stated [Plaintiff] Kisliuk was inside their business listening to the police scanner when a call for service involving a loose canine was broadcasted. Kisliuk began making various statements involving harming the canines if he found them loose." (Dkt. 41, p. 11). Plaintiff points out that this version of events was impossible: the call about the pit bull came in at 9:00, but Plaintiff only arrived at the Hospitality Center around 9:30, so Plaintiff could not have been listening to the pit bull call in the Hospitality Center.

Ms. Fitch re-established contact with the police shortly afterward, claiming that Plaintiff had heard her name and the details of her report over the radio and called her at work. (Dkt. 34, p. 13). Ms. Fitch told police that Plaintiff had called her a "dumb girl" and a "pit bull protector," threatening that "she was gonna find out what happens when she calls law enforcement". *Id.*

At 10:30 A.M., Plaintiff went to meet with Frank at Frank's request, assuming that Frank wanted to discuss Ms. Fitch's animal abuse allegations. (Dkt. 34, p. 4). When Plaintiff arrived, Frank, McHugh, and O'Neal arrested Plaintiff on accusations of threatening and intimidating a witness. *Id.* at 3–4. There was no warrant for this arrest. *Id.* at 4.

At the time of his arrest, Plaintiff had a miswak toothbrush[1] in his mouth. (Dkt. 34, p. 5). During the arrest, Frank took Plaintiff's miswak out of Plaintiff's mouth and threw it on the ground. *Id.* When Plaintiff protested, O'Neal said: "We don't take biological property." *Id.*

After his arrest, Plaintiff was interviewed regarding the radio interference. (Dkt. 34, p. 5). Plaintiff told them that he had once possessed an "unlocked" radio (i.e., one capable of interfering with the police radio channel) given to him by a man named Joe Wagner, but that he had since given that radio away. *Id.* The radio Plaintiff carried at the time of his arrest was not unlocked and therefore could not have been used to interfere with the police channel. *Id.* at 5–6.

When Plaintiff was booked, Frank directed McHugh to charge Plaintiff with "illegally using a scanning device" in addition to the charge of witness intimidation. (Dkt. 34, p. 6). McHugh added the charge with a comment of "Probable cause, I guess[.]" *Id.* At that point, O'Neal ordered the confiscation of Plaintiff's cell phone, and Plaintiff was jailed. *Id.*

After Plaintiff was released on bond, he discovered that the charge of illegally using a scanning device had been changed to interfering with radio frequencies. (Dkt. 34, p. 6). He then discovered that police had confiscated his laptops and radio equipment pursuant to a search warrant based on an application by Beak, which in turn was based on the incorrect belief that Plaintiff possessed a second (unlocked) radio. *Id.* The temporary deprivation of Plaintiff's laptops prevented him from writing articles, which was his "main occupation at the time." *Id.* at 19. Plaintiff also discovered that police "had instructed local hotels such as Motel 6 and Super 8 not to rent to me, alleging that I was causing trouble & interfering with their radio frequencies." *Id.* at 15.

Ultimately, the charges against Plaintiff were dropped. (Dkt. 34, p. 6). Plaintiff has yet to receive his radio back even though O'Neal knows it is not unlocked. *Id.* at 20.

## II. Fourth Amendment Claims

---

[1] "Teeth-cleaning sticks, commonly known as Miswak or Siwak, are popular oral hygiene aids in India, Pakistan, most of the Arabian countries, and several African countries[.]" Parveen Dahia et al., *Miswak: A Periodontist's* Perspective, J. AYURVEDA INTEGRATED MED., October 2012, at 184. The frequent use of a miswak is important in many Islamic faith traditions, with the prophet Mohammed quoted as saying: "Siwak cleanses the mouth and pleases the Lord." Sahih al-Bukhari, 2/299.

      *a. False Statements in Warrant*

To establish a Fourth Amendment violation based on judicial deception, Plaintiff "must 1) make a substantial showing of [the officers'] deliberate falsehood or reckless disregard for truth and 2) establish that, but for the dishonesty, the [search] would not have occurred." *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011) (alterations in original).

Plaintiff has adequately alleged that several statements in the warrant were either deliberately false or made with reckless disregard for the truth. For example, the warrant says that Plaintiff's radio apparently "contains at least one of the frequencies required to transmit to our department's radios." (Dkt. 41, p. 9).[2] However, Plaintiff alleges that the video from which Officer Beak drew this conclusion moves too quickly for a viewer to be able to identify any frequencies. (Dkt. 34, p. 7). The warrant also alleges that Plaintiff "has made approximately fifty posts on his Facebook demonstrating that he is actively tracking Officer's [sic] movements in real time." (Dkt. 41, p. 9). However, the only specifics the warrant provides in support of this conclusion is that Plaintiff uses some police radio jargon on Facebook. *Id.* Such "conclusory statements" are afforded "little if any weight in the probable cause analysis." *United States v. Underwood*, 725 F.3d 1076, 1084 (9th Cir. 2013). The warrant said that the police department had "experienced no less than 100 incidents of radio interference" since Plaintiff obtained his radio. (Dkt. 41, p. 10). Plaintiff asserts that the real number is, at most, 10. (Dkt. 34, p. 9).

Plaintiff also alleges that the warrant omits information that tends to rule him out as the source of the interference. For example, the warrant alleges that the radio interference would initially stop when officers announced that they were heading toward the Motel 6 where Plaintiff lived, but that "in the last few weeks the interference continues unless [Plaintiff] is contacted directly." (Dkt. 41, p. 10). However, Plaintiff alleges that he only had three contacts with police between his acquiring the radio and his arrest. (Dkt. 34, p. 9). The first of those contacts was well before the arrest and was initiated by Plaintiff. *Id.* No radio interference was taking place at the

---

[2] The court considers the contents of Document 41, a copy of the warrant at issue, because "the plaintiff refers extensively to the document [and] the document forms the basis of [one of] the plaintiff's claim[s]." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

4

time of the second contact. *Id.* at 10.  During the third contact, Plaintiff was seen by a police officer during part of the alleged interference, had been in the bathtub during a call that the interference allegedly disrupted, and answered the door for the police while "soaking wet" and "wearing a towel[,]" making it obvious to the police that he had been otherwise occupied at the time of the interference. *Id.* at 11–12.

      Finally, the warrant application included Plaintiff's arrest based on Ms. Fitch's accusations. Plaintiff claims that "[i]f they had investigated her claims at all the would've discovered she was not credible" due to her previous convictions.  (Dkt. 34, p. 5).  "[T]he statements of a victim, standing alone, may supply probable cause so long as the victim provides sufficiently detailed facts regarding the incident." *Pinckney v. City of San Jose*, 2010 WL 94266, at *4 (N.D. Cal. Jan. 6, 2010) (citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991) and *Peng v. Penghu*, 335 F.3d 970, 978 (9th Cir. 2003)).  Further, once a witness statement provides probable cause, "an officer is not ordinarily required to continue to investigate or seek further corroboration." *Ewing v. City of Stockton*, 588 F.3d 1218, 1227 (9th Cir. 2009).  However, to create probable cause on its own, the victim's statement must "cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator." *Fuller*, 950 F.2d at 1444.

      Plaintiff argues that the police should have known that Ms. Fitch's allegations were not credible given the timeline.  Specifically, Plaintiff says that although Ms. Fitch claimed that Plaintiff was in the Hospitality Center when the call about the pit bull attack came in, Plaintiff actually came to the Hospitality Center about 25 minutes *after* the call was broadcast and left 5 minutes after that, at which point Ms. Fitch called the police. (Dkt. 34, p. 4).  If the police asked Ms. Fitch what time Plaintiff was in the Hospitality Center and Ms. Fitch answered honestly, the police (who had access to the police scanner) should have known that Ms. Fitch's story was impossible.  Of course, it is possible that the police did not ask Ms. Fitch when the incident took place, or that Ms. Fitch lied about the time the incident took place (despite the presence of third-party witnesses who could contradict her), or that the police were not listening to the police radio. Taking all reasonable inferences in the light most favorable to Plaintiff, however, the court

5

1  concludes that Plaintiff has plausibly alleged facts suggesting that the police should have known
2  that Ms. Fitch's allegations were impossible.
3        Construing these allegations in the light most favorable to Plaintiff, the warrant included
4  several deliberate or reckless falsehoods. In order for such falsehoods to be actionable, however,
5  they must have been material to the granting of the warrant. A court's "inquiry into whether false
6  statements and omissions were material is a purely legal question[.]" *Chism*, 661 F.3d at 389.
7  The question is whether a truthful version of the affidavit at issue would have provided a "fair
8  probability" that Plaintiff committed a crime. *Id.* at 390. "In other words, we look[] for evidence
9  in the affidavit: (1) that a crime was committed; (2) that it was [Plaintiff] who committed the
10 crime; and (3) that evidence of the crime would be found in the place to be searched." *Id.* at 389.
11       Here, even removing the contested statements from the warrant, the court concludes that it
12 still contains sufficient information to establish probable cause. Plaintiff agrees that there was
13 some degree of radio interference ongoing, which is evidence that a crime was committed. And
14 Plaintiff does not contest the following facts:

- Plaintiff possesses a Baofeng radio. (Dkt. 41, p. 9). According to the county's radio technician, "Baofeng brand radios are easily 'unlocked' in order to broadcast on all frequencies[,] including public safety frequencies." *Id.* at 12.
- Plaintiff received an e-mail from an unknown person offering to give Plaintiff "unlocked" Baofeng radios and an anti-"Blue Line" t-shirt, proposing a protest, and stating an intention to have Officer "Jarod D Frank" fired. *Id.* at 9. Plaintiff posted a screenshot of this e-mail to his Facebook page. *Id.*
- Plaintiff uses police radio jargon on his Facebook page. *Id.* at 9.
- Plaintiff sometimes wears a rifle plate carrier with his radio attached. *Id.*
- After a hoax school shooting report, Plaintiff arrived at the school wearing a camouflage vest and carrying a radio. *Id.* at 9–10.
- When officers announced during radio interference that they would be conducting an extra patrol at the Motel 6 where Plaintiff lived, the interference would stop. *Id.* at 10.
- There was an incident of radio interference consisting of "Audit the Cops" YouTube

videos and a robotic voice repeatedly saying "Fire Jarod D Frank" and "Get the f[***] off my property". *Id.*

- Plaintiff told police that he had received a scanner from an individual named Frank Wagner, who had shown him how to use it to interfere with police frequencies. *Id.* at 11.

Taken together, this evidence indicates a "fair probability" that Plaintiff committed, or at least conspired to commit, the crime. This evidence establishes that Plaintiff was in possession of a radio capable of interfering with the police radio, frequently listened to the police radio channel, had at some point owned a scanner capable of interfering with police frequencies, knew how to use that scanner to interfere with police frequencies, and had publicized a planned protest whose message was later broadcast as radio interference. Further, when police announced an intent to patrol the Motel 6 where Plaintiff lived, the interference would stop; even Plaintiff acknowledges that the logical implication is that a resident of the Motel 6 was causing the interference and stopped transmitting for fear of detection by the additional patrol. (Dkt. 34, p. 11). These facts give rise to a "fair probability" that Plaintiff was the one responsible for the interference.

Finally, the warrant notes that Plaintiff missed his checkout time at the Motel 6 and that his personal belongings had been gathered in the manager's office. (Dkt. 41, p. 12). It was reasonable for police to conclude that Plaintiff's radio would be with his belongings if it was not on his person. It was also reasonable to infer based on the circumstances of the interference that the radio had been present at the Motel 6. As for Plaintiff's other electronic items, the fact that some of the interference consisted of YouTube videos meant that a search of Plaintiff's possessions capable of playing a YouTube video was reasonable, as did the fact that Plaintiff appeared to be in electronic communication with a possible conspirator possessing unlocked radios.

Because any false statements in the warrant were not material to the probable cause determination, Plaintiff has failed to state a claim for judicial deception.

b. *Arrest on Fitch Accusations*

Plaintiff claims a Fourth Amendment violation based on his arrest on the allegedly spurious allegations of Ms. Fitch. Even if the court accepts that the Fitch accusations did not

constitute probable cause for Plaintiff's arrest, however, police had probable cause to suspect Plaintiff of committing another crime: interfering with radio frequencies. "It is well-established that [i]f facts support probable cause . . . for one offense, an arrest may be lawful even if the officer invoked, as the basis for the arrest, a different offense which lacks probable cause." *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1165 (9th Cir. 2022) (internal quotations omitted) (alterations in original).

For § 1983 purposes, "[p]robable cause to arrest exists when there is a 'fair probability or substantial chance of criminal activity' by the arrestee based on the totality of the circumstances known to the officers at the time of arrest." *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1164 (9th Cir. 2022) (quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012) (en banc)). This "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up). Further, an officer sued for unlawful arrest is entitled to qualified immunity if "it is <u>reasonably arguable</u> that there was probable cause for arrest.'" *Reed v. Lieurance*, 863 F.3d 1196, 1207 n.4 (9th Cir. 2017). "An officer would not be on notice that his or her action was unreasonable unless all reasonable officers would agree that there was no probable cause in this instance.'" *Johnson v. Barr*, 79 F.4th 996, 1005 (9th Cir. 2023).

Here, as discussed above, it appears that a reasonable officer at the time of Plaintiff's arrest could have found probable cause to arrest Plaintiff for interfering with police radio frequencies. Therefore, Plaintiff has not adequately stated a claim for false arrest.[3]

*Destruction of Miswak*

---

[3] The Court notes that the facts, as alleged by Plaintiff, appear more suited to a malicious prosecution claim than one for false arrest. "To succeed on [a malicious prosecution] claim, a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person." *Chiaverini v. City of Napoleon*, 602 U.S. 556, 558 (2024). And where an "official brings multiple charges, only one of which lacks probable cause[,]" the presence of the valid charge does not categorically bar a malicious prosecution claim on the invalid one. *Id.* However, as a § 1983 malicious prosecution claim involves specific intent elements that Plaintiff has not alleged here, the court declines to construe Plaintiff's false arrest claim as one for malicious prosecution. *See Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019) (explaining elements of malicious prosecution under § 1983).

The Ninth Circuit has held that "the Fourth Amendment forbids . . . the destruction of a person's property, when that destruction is unnecessary—*i.e.*, when less intrusive, or less destructive, alternatives exist." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977–78 (9th Cir. 2005). Here, the Court can think of at least one less destructive alternative to throwing Plaintiff's miswak on the ground– putting it in a plastic bag or other sanitary container and keeping it with his other property during his detention. Accordingly, Plaintiff has adequately stated a Fourth Amendment claim relating to the destruction of his miswak.

      *c. Deprivation of Phone, Laptops, and Radio*

Plaintiff argues that his Fourth Amendment rights were violated when his phone was seized. However, this court has already held that the seizure of Plaintiff's phone pursuant to a lawful arrest was valid. (Dkt. 26, p. 7). Because probable cause existed to suspect Plaintiff of interfering with the police radio frequency, his arrest was lawful. Similarly, Plaintiff has pled no facts indicating that the seizure of his laptops (for which there was probable cause) was unlawful.

Plaintiff has, however, stated a claim for his loss of the radio. While there may have been initial probable cause for police to seize and inspect it, "[t]he Fourth Amendment doesn't become irrelevant once an initial seizure has run its course." *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017). "A seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force. Thereafter, the government must cease the seizure or secure a new justification." *Id.* Here, based on the facts provided by Plaintiff, the police had no reason to retain the radio after discovering that it was incapable of interfering with police frequencies. Accordingly, Plaintiff has stated a valid Fourth Amendment claim relating to the failure to return his radio.

**III.   Fourteenth Amendment Claims**

      *a. Arrest and Search*

Plaintiff alleges that his arrest on the Fitch allegations and the false statements in the search warrant establish that he was deprived of due process contrary to the Fourteenth Amendment. However, Plaintiff argues that the process he was due was the establishment of

9

probable cause. (Dkt. 34, p. 21). The probable-cause requirement for searches and seizures is explicit in the Fourth Amendment, and the Ninth Circuit has found "no case in which compliance with the Fourth Amendment in the context of a criminal investigation or proceeding has been held not to satisfy due process as well." *Sanders v. City of San Diego*, 93 F.3d 1423, 1429 (9th Cir. 1996) (collecting cases). As detailed above, Plaintiff has not alleged a violation of his Fourth Amendment rights based on the warrant, arrest, or charges. The destruction of Plaintiff's miswak may have violated the Fourth Amendment, but this court has already held that a Fourteenth Amendment claim regarding the miswak is "untenable" in light of the Fourth Amendment cause of action. (Dkt. 26, p. 9). The same would hold true for malicious prosecution. Accordingly, Plaintiff has not stated a Fourteenth Amendment claim regarding his arrest, charging, or search.

   b. *Calls to Hotels*

Plaintiff claims that the police department's calls to local hotels "deprived me of my liberty to stay at these hotels without due process, in violation of my right to equal protections" and caused "harm to my reputation." (Dkt. 34, pp. 16, 21).

To the extent Plaintiff is invoking his right to stay at the hotels, however, "[t]here is no fundamental right to housing" under substantive due process. *Santa Cruz Homeless Union v. Bernal*, 514 F.Supp.3d 1136, 1141 (N.D. Cal. 2021). And to the extent Plaintiff seeks liability based on harm to his reputation, he must show that "a right or status previously recognized by state law was distinctly altered or extinguished." *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1186 (9th Cir. 2008) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)), *reversed and remanded on other grounds* by *Los Angeles County v. Humphries*, 562 U.S. 29 (2010). In California, an "abstract need" or "desire" for something, or a "unilateral expectation" of it, does not establish "a legitimate claim of entitlement to a benefit." *Blank v. Kirwan*, 703 P.2d 58, 62–63 (Cal. 1985). Therefore, Plaintiff's desire to patronize certain hotels in the future is insufficient to create "a right or status . . . recognized by state law" as required to state a claim for reputational damage.

**IV. Liability of Captain O'Neal**

"A supervisor can be liable in his individual capacity for his own culpable action in the

training, supervision, or control of his subordinates[.]" *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011). And a supervisor's "acquiescence in the unconstitutional conduct of his subordinates" is "sufficient to state a claim of supervisory liability[.]" *Id.*

Plaintiff has adequately alleged that O'Neal acquiesced in the destruction of Plaintiff's miswak because O'Neal was present during its confiscation and defended Frank's actions in destroying it. Further, Plaintiff has adequately alleged that O'Neal is acquiescing in the continued, unwarranted confiscation of Plaintiff's radio. As for the other counts, Plaintiff has failed either to allege a constitutional violation or specify O'Neal's involvement.

### V. *Monell* Liability

A municipality can be held liable under 42 U.S.C. § 1983 if a "policy or custom" of the municipality causes a plaintiff's rights to be violated. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Liability only attaches if the policy "inflicts the injury" of which the plaintiff complains. *Id.*; *see Dougherty v. City of Covina*, 654 F.3d 892, 900–01 (dismissing complaint which lacked "any facts demonstrating that [the plaintiff's] constitutional deprivation was the result of a custom or practice of the City . . . or that the custom or practice was the 'moving force' behind his constitutional deprivation.").

Plaintiff has plausibly alleged that his miswak was destroyed pursuant to a formal policy of discarding "biological" possessions of arrestees. Accordingly, Plaintiff has stated a *Monell* claim as to its destruction.

Besides formal policies, *Monell* liability can arise from "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy[.]" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Plaintiff alleges that the City has "an unwritten policy of violating the 4th & 14th amendments." (Dkt. 34, p. 16). Specifically, Plaintiff accuses the City of "failing to train their officers before their violations of the 4th and 14th amendments and refusing to discipline them after." *Id.* The Court will take the failure-to-train and failure-to-discipline theories in turn.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). For liability to

attach, "a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (cleaned up). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62. The similarity cannot be only that the violations share a generalized class: the *Connick* Court found that a pattern of *Brady* violations was insufficient to create failure-to-train liability in that case because none of those previous *Brady* cases "involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind[,]" making them dissimilar to the *Connick* plaintiff's claims. *Id.* at 62–63.

Plaintiff alleges the following pattern of violations of the Fourth and Fourteenth Amendments:

- Officer O'Neal attempted to arrest him for "run[ning] up on officers with your hand on your knife". (Dkt. 34, p. 16). In fact, Plaintiff had only had his hand in the pocket that contained his pocketknife and had not "run up" on O'Neal, but instead approached a person whose car O'Neal was towing. *Id.*

- On another occasion, Plaintiff stepped out of his hotel room to smoke as O'Neal happened to be walking by. *Id.* at 17. Without apparent cause, and possibly in retaliation for Plaintiff's recording the tow truck incident, O'Neal briefly handcuffed Plaintiff. *Id.*

- Complaints submitted by Plaintiff to the Fort Bragg Chief of Police were "rejected as mistaken" despite some of them being corroborated by video evidence. *Id.* The Chief of Police has informed Plaintiff that "any further complaints . . . would be considered frivolous & not investigated[.]" *Id.*

- Plaintiff also complained to the City of Fort Bragg about O'Neal's conduct in the above two incidents, but both claims were denied. *Id.* at 17–18.

- The City of Fort Bragg is also "deliberate[ly] indifferen[t] concerning dangerous pit bulls[.]" *Id.* at 18.

The Court cannot infer the existence of a policy or custom from these allegations. As an initial matter, Plaintiff's broad allegation of "an unwritten policy of violating the 4th and 14th

1 amendments" fares no better than the allegation of a series of Brady violations did in *Connick*—to
2 state a cause of action under *Monell*, a greater degree of specificity is required. Turning to the
3 specific incidents Plaintiff alleges, Plaintiff has named two cases of unlawful seizure of his person,
4 two cases of wrongfully ignored complaints, and one case of failure to control the local pit bull
5 population. The claims Plaintiff has adequately stated here—both for unlawful seizure of
6 property—are different in kind from the previous conduct he complains of, so Plaintiff has failed
7 to show a pattern of similar violations by untrained employees.

8  Further, the adequately pled violations of Plaintiff's rights do not fall within the "narrow
9 range of circumstances" in which the consequences of failing to train are "so patently obvious"
10 that a pattern of violations is not required for liability. *Connick*, 563 U.S. at 63–64 (giving
11 hypothetical example of police not being trained in constitutional limits on use of deadly force).
12 Finally, Plaintiff has alleged insufficient details for this court to infer that a failure to train, as
13 opposed to the one-time act or omission of an individual, caused him to be deprived of his radio,
14 especially as it appears that his other property was ultimately returned. Accordingly, Plaintiff has
15 not stated any claims on a failure-to-train theory.

16  Plaintiff's claim arising from the City's failure to discipline O'Neal, however, may
17 proceed. Several courts in this District have concluded that "[i]f the same officer repeatedly
18 violates the constitutional rights of a city's residents, and the city is on notice of these violations
19 and fails to properly discipline the officer, by definition the city is deliberately indifferent to the
20 likelihood that the officer will continue to commit constitutional violations in the future[.]"
21 *Caldwell v. City of San Francisco*, 2020 WL 7643124, at *14 (N.D. Cal. Dec. 23, 2020) (quoting
22 *Hayes v. Riley*, 2020 WL 5816581, at *2 (N.D. Cal. Sept. 30, 2020)). This aligns with *Larez v.
23 City of Los Angeles*, in which the Ninth Circuit concluded that evidence of an ineffective system
24 of discipline relating to citizen complaints was a "policy or custom [which] contributed to the
25 police excesses complained of because the procedures made clear to officers that . . . they could
26 get away with anything." 946 F.2d 630, 647 (9th Cir. 1991). Plaintiff has alleged that Officer
27 O'Neal repeatedly violated his rights and that the City failed to discipline O'Neal despite the
28 existence of evidence supporting Plaintiff's claims. At this preliminary stage, that is sufficient to

state a *Monell* claim against the City for failure to discipline O'Neal.

## VI. Leave to Amend

Plaintiff has moved for leave to amend his complaint. (Dkts. 36, 42). Specifically, Plaintiff wishes to allege a failure-to-supervise theory of *Monell* liability, to claim that all of O'Neal's and other officers' actions against Plaintiff are intentional and related, to claim that the City of Fort Bragg has denied Plaintiff several public records requests relating to these incidents, and to claim that Ms. Fitch was an unreliable witness because she requires the use of a hearing aid. The court finds that Plaintiff's allegations do not support a claim for failure to supervise because they do not demonstrate that the City "was on actual or constructive notice that its omission would likely result in a constitutional violation" and "could have prevented the violation [of which Plaintiff complains] with an appropriate policy." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (internal quotations omitted). Plaintiff's proposed factual allegations as to the relatedness of incidents, the denial of Plaintiff's public records requests, and Ms. Fitch's hearing abilities would not change the court's analysis of Plaintiff's claims. Because these amendments would be futile, leave to amend will be denied

## VII. Status of Dismissal

A district court's discretion to dismiss claims with prejudice "is particularly broad where plaintiff has previously amended the complaint." *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 454 (9th Cir. 2011). In this case, Plaintiff has had the opportunity to amend his complaint three times. The court finds that further amendment of the following previously-alleged claims would be futile, and therefore dismisses them with prejudice:

- False Arrest
- Judicial Deception/False Swearing (regarding the warrant)
- Unlawful Search
- Unlawful Seizure (regarding Plaintiff's cell phone)

Plaintiff's other claims will be dismissed without prejudice.

## VIII. Conclusion

For the reasons stated above, Defendants' motion is DENIED as to the following claims:

- Fourth Amendment - Destruction of Miswak
- Fourth Amendment - Failure to Return Radio
- *Monell*/Fourth Amendment - Failure to Discipline O'Neal

Defendants' motion is otherwise GRANTED. The claims specified in Section VII, *supra*, are DISMISSED WITH PREJUDICE. Plaintiff's other claims are DISMISSED WITHOUT PREJUDICE.

Plaintiff's motions to amend are DENIED.

**IT IS SO ORDERED.**

Dated: October 30, 2024

ROBERT M. ILLMAN
United States Magistrate Judge

15